**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Mohamed Basher AL–TALIB,
Defendant–Appellant.**

**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Hector Rivera MUNOZ, Defendant–
Appellant.**

Nos. 94–5584, 94–5687.

United States Court of Appeals,
Fourth Circuit.

Argued April 7, 1995.

Decided May 30, 1995.

**ARGUED:** John Kenneth Zwerling, Moffitt, Zwerling & Kemler, P.C., Alexandria, VA, for appellant Munoz; Michael William Lieberman, Jonathan Shapiro & Associates, P.C., Alexandria, VA, for appellant Al–Talib. Thomas More Hollenhorst, Asst. U.S. Atty., Alexandria, VA, for appellee. **ON BRIEF:** Kyle W. O'Dowd, Moffitt, Zwerling & Kemler, P.C., Alexandria, VA, for appellant Munoz; Jonathan Shapiro, Jonathan Shapiro & Associates, P.C., Alexandria, VA, for appellant Al–Talib. Helen F. Fahey, U.S. Atty., Alexandria, VA, for appellee.

Before WILKINSON and MICHAEL, Circuit Judges, and CHAPMAN, Senior Circuit Judge.

Affirmed by published opinion. Judge WILKINSON wrote the opinion, in which Judge MICHAEL and Senior Judge CHAPMAN joined.

## OPINION

WILKINSON, Circuit Judge:

Mohamed Basher Al–Talib and Hector R. Munoz were convicted of conspiracy to possess and distribute marijuana, as well as attempted possession of marijuana with intent to distribute. Appellants complain that the government improperly "manufactured" venue when they were arrested following a sting operation in Virginia. They also argue that the government violated the Posse Comitatus Act, 18 U.S.C. § 1385, in setting up this sting. Further, Basher and Munoz make a number of individual challenges to the trial court's rulings on suppression of evidence and its factual findings underlying their respective sentences. Because we find no error in the proceedings below, we affirm the appellants' convictions and sentences.

### I.

#### A.

On February 1, 1994, Ronnie Tankersley was stopped by the Nebraska State Patrol for a traffic violation on I–80 in Hall County, Nebraska. After Tankersley signed a search consent form, the officers discovered eight bales of marijuana weighing about ninety kilograms in the trunk. The car, a 1989 Oldsmobile, belonged to Tom Minich, who had given Tankersley written permission to drive it. Tankersley was arrested and agreed to cooperate with the authorities.

Based on information obtained from Tankersley, both state and federal authorities began to investigate a suspected drug ring involving Hector Munoz, Higinio Avilez, Minich, James Lull, Inocento Molina, Michael Pisante, and several others. On February 2, acting on Tankersley's information, U.S. Drug Enforcement Administration ("DEA") agents raided a warehouse in Tucson, Arizona and seized 25 bales of marijuana weigh-

ing about 800 pounds, as well as various documents and other supplies.

Tankersley also told the authorities that when he was stopped, he had been on his way to Washington, D.C. to deliver marijuana to one of the conspiracy's buyers. The DEA decided to set up a controlled delivery of the marijuana. Agents arranged to have the Oldsmobile and the marijuana airlifted to the D.C. area by the United States Transportation Command. On February 4, a C–130 transport manned by an Air Force crew flew the car and drugs from Nebraska to Maryland. The car was then parked at a Days Inn in Alexandria, Virginia, and Tankersley was ensconced at the motel. The DEA began surveillance of the site, waiting for Tankersley's contacts to arrive.

On February 6, the DEA monitored several phone calls from Munoz and Avilez to Tankersley. Munoz specifically told Tankersley not to go anywhere, but to stay in Virginia. Tankersley then began to experience heart trouble, and was taken to a nearby hospital in Mount Vernon, Virginia. The next day, the DEA had the car towed to Redman's Fleet Service in Newington, Virginia. Munoz called Tankersley at the hospital, who informed him that the car had been towed. Munoz told Tankersley that he was in Virginia and intended to pick up the car the next day.

Munoz appeared at Redman's on the morning of February 8 to pick up the 1989 Oldsmobile. A DEA agent posing as a clerk told him he needed to bring a license, the vehicle registration, and the owner of the car. Munoz was then observed leaving the area with two other individuals in an 1988 Chevrolet Caprice registered to Mohamed Basher. The following morning, on February 9, DEA agents observed Munoz, Basher, and Avilez together in a 1993 Jeep Cherokee at the Days Inn in Alexandria where Tankersley had been staying. Basher was driving the vehicle. Shortly afterward, the three appeared at the Mount Vernon Hospital. Agents observed Munoz go into the hospital for about ten minutes, and then rejoin Basher and Avilez in the car.

After leaving the hospital, the three went back to Redman's and drove around to the rear of the building. Avilez and Basher waited while Munoz went inside with Tankersley's driver's license and a permission slip. Munoz was arrested as he tried to take possession of the car. Basher and Avilez were also arrested shortly thereafter. A cellular phone and a pager were seized at that time. After Basher's arrest, DEA agents in D.C. seized his car, which contained $35,000 in cash and smelled strongly of marijuana. A search of Basher's D.C. residence also revealed a small bag of marijuana, a gun, and various documents.

### B.

All three individuals were charged with conspiracy to possess and distribute one thousand kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and attempted possession with intent to distribute fifty kilograms or more of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), 846 and 18 U.S.C. § 2. The three defendants pled not guilty, and, on May 31, 1994, were provided a bench trial in the Eastern District of Virginia.

James Lull testified for the prosecution. He detailed how he had worked to distribute marijuana through Munoz's network. Lull testified that he was paid to drive loads of marijuana to various points across the country. Lull described one episode in July, 1993, when Munoz took a motor home to the conspiracy's warehouse in Tucson and loaded it with 743 pounds of marijuana. Tankersley and Lull then drove the drugs to the east coast and delivered them to customers in New York and Massachusetts. They were each paid about $4700 for this trip.

Ronnie Tankersley likewise testified for the prosecution. He stated that he had met Munoz in 1990 in Arizona. Munoz frequently discussed drugs and his drug operations with Tankersley, and ultimately recruited him to assist in his drug enterprise. Tankersley also described the events leading up to his arrest, testifying that the organization had asked him to drive the Oldsmobile with the marijuana load to D.C. Munoz, Avilez, Molina and Minich were involved in planning the trip. Molina gave Tankersley a pager num-

ber to call, Minich supplied the car, and Munoz loaded it with the drugs. Tankersley was promised fifty dollars per pound for the delivery. Each day during the trip he called to check in with Munoz. After he was arrested in Nebraska and agreed to cooperate, Tankersley called Munoz and told him that the car had broken down in order to give the authorities time to set up the controlled buy in Virginia.

The rest of the evidence consisted of testimony by various DEA agents and other authorities who set up and conducted the operation in Virginia, as well as corroborating evidence in the form of phone records, notes, airline tickets, receipts, and other documents. The agents described the phone calls between Munoz and Tankersley, outlined the movements of Munoz and Basher while in Virginia (including their counter-surveillance driving tactics), and detailed the records seized from the defendants. Most of the trial consisted of the presentation of the government's evidence. The defendants chose not to take the stand in their own defense, but cross-examined the various government witnesses on the details of their respective testimony. At the close of evidence, the trial court found the defendants guilty on both counts. Avilez disappeared during the course of the trial and was convicted *in absentia*.

A sentencing hearing for Basher was held on July 29, 1994. The district court imposed a sentence of 262 months on the conspiracy count and 240 months on the attempted possession count, to run concurrently, as well as a period of supervised release.[1] On September 9, 1994, Munoz was given an identical sentence. Defendants now appeal.

## II.

Basher and Munoz first raise a challenge to venue in the Eastern District of Virginia. The Constitution requires that "the Trials of all Crimes . . . shall be held in the State where the said Crimes shall have been committed." U.S. Const. Art. III, § 2. For continuing offenses, Congress has provided that venue may be established in any district "in which such offense was begun, continued, or completed." 18 U.S.C. § 3237(a) (1988); Fed.R.Crim.P. 18. Thus, in a conspiracy case like the one before us, a prosecution may be brought in any district in which any act in furtherance of the conspiracy was committed. *United States v. Anderson*, 611 F.2d 504, 509 n. 5 (4th Cir. 1979). To establish venue, the government need only show that an act occurred in the district by a preponderance of the evidence. *United States v. Porter*, 821 F.2d 968, 975 (4th Cir.1987), *cert. denied*, 485 U.S. 934, 108 S.Ct. 1108, 99 L.Ed.2d 269 (1988).

Here, the trial court found a number of contacts between the conspirators and the district of Virginia, aside from the events surrounding the sting, which constituted acts sufficient to establish venue. In particular, the government showed that Basher had travelled through Virginia on his way to and from Arizona in late January, 1994. Basher received a speeding ticket in Virginia on his way to Arizona, and airline records show he returned by plane to Washington National Airport in Virginia. This trip was made to set up the purchase of marijuana which Tankersley was bringing to D.C. Moreover, Basher's car was registered in Virginia, and documents seized in Basher's D.C. residence indicated that some of his distributors operated in Virginia.

Taken together, this evidence is more than enough to establish venue. Far more insubstantial acts have served to establish venue in similar conspiracy cases. *United States v. Naranjo*, 14 F.3d 145, 147 (2d Cir.) (telephone calls to district established venue), *cert. denied*, — U.S. ——, 114 S.Ct. 1862, 128 L.Ed.2d 484 (1994); *United States v. Lewis*, 676 F.2d 508, 511 (11th Cir.) (same), *cert. denied*, 459 U.S. 976, 103 S.Ct. 313, 74 L.Ed.2d 291 (1982). Also, because proof of acts by one co-conspirator can be attributed to all members of the conspiracy, Basher's contacts with the Eastern District of Virginia serve to establish venue for all the defendants. *United States v. Snead*, 527 F.2d 590, 591 (4th Cir.1975). Therefore, venue was properly established here.

---

1. Basher's sentence was subsequently modified due to a change in the Sentencing Guidelines.

Basher and Munoz nevertheless argue that Virginia was an improper venue in this case because the government manipulated events to draw the defendants into a venue where they otherwise never would have gone. They contend that the only reason any of the defendants came to Virginia was because the DEA chose to conduct the controlled delivery there. Such circumstances, they argue, amount to "manufactured venue," and require that the case be dismissed or remanded for a new trial in another venue.

We do not agree. There is no such thing as "manufactured venue" or "venue entrapment." Defendants appear to have invented the idea by mixing together several inapposite concepts. It is true that the government may not manipulate events to create federal jurisdiction over a case. *United States v. Coates,* 949 F.2d 104 (4th Cir.1991). This is not the same thing, however, as choice of venue. *See Lewis,* 676 F.2d at 511 n. 3 (distinguishing jurisdiction manipulation from government's choice of venue). It is also true that there are limits on the government's ability to "entrap" persons into crimes. *See Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958) (requiring proof of "predisposition"). Entrapment rules have no applicability to venue, however. The purpose of entrapment doctrine is to ensure that the government does not "implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission." *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). Such substantive concerns of criminal law bear little relationship to a procedural concept such as venue. *See United States v. Griley,* 814 F.2d 967, 973 (4th Cir.1987) (noting that venue is not a substantive element of the offense).

Further, if the predisposition to commit the crime exists, it hardly matters for entrapment purposes where the acts are carried out. This is especially true in cases of far-flung drug conspiracies. Because those who commit such crimes frequently move among various venues, they assume the risk that they may become subject to prosecution in any of a number of districts. The defendants in this case were operating a drug ring that spanned the country, and so their claim that they would not have ventured into Virginia absent the government's inducements rings quite hollow.

Moreover, government agents must have flexibility in conducting sting operations against drug conspiracies. Concerns of safety, efficiency, and convenience assume great importance in such circumstances, and are best assessed by the officers at the time. Here, for example, the motel in Virginia that the DEA selected was, in the government's opinion, the most secure and effective place available for this particular operation. Law enforcement authorities engage in a dangerous undertaking when they attempt to trap drug dealers into revealing their activities by setting up controlled buys of narcotics. We will not further complicate their efforts by second-guessing their choice of location for such operations under the guise of venue entrapment. *See United States v. Jones,* 18 F.3d 1145, 1155 (4th Cir.1994) (noting that " 'a well-constructed sting is often sculpted to test the limits of the target's criminal inclinations. Courts should go very slowly before staking out rules that will deter government agents from the proper performance of their investigative duties.' ") (quoting *United States v. Connell,* 960 F.2d 191, 196 (1st Cir.1992)).

## III.

The Posse Comitatus Act ("PCA"), 18 U.S.C. § 1385 (1984), states that:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined not more than $10,000 or imprisoned not more than two years, or both.

18 U.S.C. § 1385. The purpose of this Act is to uphold the American tradition of restricting military intrusions into civilian affairs, except where Congress has recognized a special need for military assistance in law enforcement. *United States v. Walden,* 490

F.2d 372, 375 (4th Cir.), *cert. denied,* 416 U.S. 983, 94 S.Ct. 2385, 40 L.Ed.2d 760 (1974).

 Appellants allege that a violation of the Act occurred during the course of the DEA's "controlled delivery" of the drugs. Specifically, Basher and Munoz contend that the DEA's use of an Air Force C–130 transport plane to fly the car and drugs from Nebraska to Virginia was an impermissible utilization of military resources in civilian law enforcement under the PCA. They argue that the DEA had no authorization to employ the Air Force in this manner, and that consequently the entire sting operation culminating in appellants' arrest should be null and void.

We think this argument lacks merit for several reasons. The use of military resources in this case had no direct impact on the defendants whatsoever. The DEA merely used an Air Force transport as a preliminary step in setting up the sting; it did not use federal troops to invade appellants' homes, nor did it employ the military to hunt down or confine the suspects. This alleged "violation" is too attenuated from the supposed "harm" to provide standing on the part of defendants to contest it. *See Allen v. Wright,* 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984) (party must allege personal injury fairly traceable to allegedly unlawful conduct). Without some direct, personal connection to the military's involvement in their case, defendants cannot draw on the PCA as a means of challenging their arrests or convictions. *See Bissonette v. Haig,* 776 F.2d 1384, 1390 (8th Cir.1985) (distinguishing direct military involvement in investigation from passive support), *aff'd,* 485 U.S. 264, 108 S.Ct. 1253, 99 L.Ed.2d 288 (1988).

 Moreover, no violation of the PCA actually occurred here. This DEA airlift was specifically authorized by § 1004 of the National Defense Authorization Act for Fiscal Year 1991 ("NDAA"), which allows military "transportation of supplies and equipment for the purpose of facilitating counter-drug activities" if requested by the official with counter-drug responsibilities at a particular agency. Pub.L. No. 101–510 § 1004, 104 Stat. 1629 (Nov. 5, 1990). Section 1004 was extended through fiscal year 1994 in additional appropriations. Pub.L. No. 103–160 § 1121, 107 Stat. 1753 (Nov. 30, 1993). The Administrator of the DEA made a proper request for military airlift support under § 1004 in a 1993 memorandum, which was approved by the Deputy Assistant Secretary of Defense with responsibility for Drug Enforcement Policy and Support. Given the grant of legislative authority in § 1004, the coordination of the airlift became the internal affair of the executive branch of government.

 Finally, there is no remedy available to appellants in this context. As a general matter, the exclusionary rule is not a remedy for violations of the PCA. *Griley,* 814 F.2d at 976; *United States v. Wolffs,* 594 F.2d 77, 85 (5th Cir.1979). Where, as here, the military operation at issue involved no seizure of evidence, the exclusionary rule is clearly unavailable. *Griley,* 814 F.2d at 976. *See also Hayes v. Hawes,* 921 F.2d 100, 103 (7th Cir.1990) (no suppression of evidence where military assistance did not involve search and seizure). This result comports with the Supreme Court's command to restrict application of the exclusionary rule to "those areas where its remedial objectives are most efficaciously served." *United States v. Calandra,* 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561 (1974).

## IV.

Basher and Munoz each raise individual claims of error with respect to their arrests and convictions. There is no merit to these claims.

### A.

 First, Munoz argues that the district court erred by refusing to allow him to challenge the search of the vehicle Tankersley was driving when stopped in Nebraska. It is well-established that a criminal defendant does not have standing to contest the search of a third party unless he can show he had a reasonable expectation of privacy in the area searched or the property seized. *See, e.g., United States v. Payner,* 447 U.S. 727, 731, 100 S.Ct. 2439, 2443–44, 65 L.Ed.2d 468 (1980); *Rakas v. Illinois,* 439 U.S. 128,

133–34, 99 S.Ct. 421, 424–26, 58 L.Ed.2d 387 (1978). Munoz contends that he had just such a legitimate expectation of privacy in the Oldsmobile because he was Tankersley's supervisor and thus "maintained considerable control" over the vehicle. This "coconspirator exception" to the rule of standing was squarely rejected in *United States v. Padilla,* —— U.S. ——, ——, 113 S.Ct. 1936, 1939, 123 L.Ed.2d 635 (1993). No expectation of privacy is created simply because one has "a supervisory role in the conspiracy or joint control over the place or property involved in the search or seizure." *Id.* at ——, 113 S.Ct. at 1937. Munoz therefore had no standing to contest this search.

### B.

■ Next, we turn to Basher's claim that his arrest was improper. A warrantless arrest, like the one in this case, requires that the arresting officers possess probable cause to believe that the person has committed or is committing a felony offense. *United States v. Watson,* 423 U.S. 411, 422, 96 S.Ct. 820, 827, 46 L.Ed.2d 598 (1976). If probable cause was lacking, as Basher argues, the evidence seized as a result of his arrest should have been suppressed.

■ To determine whether probable cause existed, courts look to the totality of the circumstances known to the officers at the time of the arrest. *Illinois v. Gates,* 462 U.S. 213, 230–31, 103 S.Ct. 2317, 2328–29, 76 L.Ed.2d 527 (1983). Here, the DEA had probable cause to arrest Basher. For two days, DEA agents watched Basher travel around Virginia with Munoz and Avilez in an obvious attempt to obtain the marijuana, going to Tankersley's motel, the hospital, and the car depot. Basher was serving as the driver throughout this period. Agents also observed him engage in what they perceived to be counter-surveillance driving tactics. For example, Basher made u-turns to check for tails, and drove around to the back of Redman's in an attempt to keep a low profile. An officer could have reasonably inferred that Basher was engaged in committing a felony. Probable cause has often been upheld in similar circumstances. *See, e.g., United States v. Clark,* 754 F.2d 789, 791–92

(8th Cir.1985). The district court properly denied Basher's motion to suppress.

### C.

■ Basher also challenges the sufficiency of the evidence used to convict him. He contends that the evidence shows only that he knew Munoz and Avilez, not that he was involved in the conspiracy. The evidence could just as easily have been interpreted, Basher argues, to indicate that he was merely squiring his friends around the Washington, D.C. area while they were in town.

■ We disagree. The evidence must be assessed in the light most favorable to the government, and the verdict will stand unless no rational finder of fact could have found the essential elements of the crime beyond a reasonable doubt. *United States v. Banks,* 10 F.3d 1044, 1051 (4th Cir.1993); *United States v. Jones,* 735 F.2d 785, 790 (4th Cir.), *cert. denied,* 469 U.S. 918, 105 S.Ct. 297, 83 L.Ed.2d 232 (1984). There is ample evidence here from which the trial court could have rationally determined that Basher was a participant in this conspiracy. Aside from the fact that Basher aided Munoz and Avilez while they were attempting to acquire marijuana, the prosecution showed that Basher had travelled to Arizona several days earlier to set up a drug deal, that he made phone calls on a phone used by other members of the conspiracy, that his car smelled of marijuana and held about $35,000 in cash and eleven boxes of ziploc bags, and that his residence contained notes relating to drug operations, as well as a gun and an amount of marijuana.

■ All told, this evidence is more than sufficient to establish Basher's guilt. Basher concedes that a conspiracy existed, and once a conspiracy is established, all that is required is a "slight connection between the defendant and the conspiracy to support the conviction." *United States v. Brooks,* 957 F.2d 1138, 1147 (4th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 3051, 120 L.Ed.2d 917 (1992). The evidence demonstrates that Basher's connection was a great deal more than slight.

## V.

Finally, both Basher and Munoz complain of errors in their respective sentencings. Again, these challenges lack merit.

### A.

■ Munoz complains first that the district court improperly assigned him a three-level increase under § 3B1.1(b) of the Sentencing Guidelines for having acted as a manager or supervisor in a conspiracy of five or more persons. *See* U.S.S.G. § 3B1.1(b). Contrary to Munoz's contention that the court failed to make adequate findings on this issue, the district court specifically found that Munoz acted as a manager in a large criminal enterprise, supervising the preparation of marijuana for shipment and sending out his inferiors to deliver the drugs. This enterprise involved more than five persons, including the three defendants, Molina, Minich, Pisante, Tankersley, Lull, Jeff Carter, and several others. In making these findings, the court relied on extensive testimony by Tankersley and Lull, who were among the individuals supervised by Munoz and who described his activities in detail. This evidence supports the conclusion that Munoz was a manager or supervisor, and thus the court's findings were not clearly erroneous.[2] *See United States v. Sheffer*, 896 F.2d 842, 846 (4th Cir.), *cert. denied*, 498 U.S. 968, 111 S.Ct. 432, 112 L.Ed.2d 416 (1990).

### B.

■ Next, Munoz challenges the court's computation of the quantities of drugs attributable to him. The trial court found that Munoz was accountable for over 1,000 kilograms of marijuana. The government was required to show quantity by a preponderance of the evidence. *United States v. Mark*, 943 F.2d 444, 450 (4th Cir.1991). Again, the court's finding will not be upset unless clearly erroneous. *Sheffer*, 896 F.2d at 846. The evidence showed that Munoz was dealing in extremely large quantities of marijuana. The total amounts wrapped and

delivered by Tankersley and Lull alone exceeded 1,000 kilograms. Moreover, the government introduced evidence that suggested Munoz possessed or sold hundreds or even thousands of additional kilograms of drugs. For example, Tankersley testified that Munoz once mentioned that one of his cohorts had stolen a shipment of 2,000 pounds (or 907 kilograms) of marijuana. Given this evidence, we cannot say the trial court's sentencing determination was clearly erroneous.

### C.

■ The sentencing challenge raised by Basher concerns the court's decision to charge him with career offender status under § 4B1.1 of the Guidelines. Such a charge requires at least two prior felony convictions for crimes of violence or controlled substance violations. The court here relied on two prior convictions in making this determination—a 1987 conviction for attempted extortion, and a 1990 conviction for possession with intent to distribute marijuana. Basher argues first that attempted extortion is not a crime of violence. He is directly contradicted by § 4B1.2(1)(ii), which specifically lists extortion as a crime of violence, and § 4B1.2 comment (n.1), which adds that attempts may also qualify. Second, Basher maintains that his 1990 conviction relates to the instant offense and so is not a prior conviction. This 1990 offense, however, did not involve any conduct relevant to the instant offense under § 1B1.3 and § 4A1.2. As a result, the sentence Basher received was proper in all respects.

### VI.

For the foregoing reasons, the defendants' convictions and sentences are

*AFFIRMED.*

---

**2.** We also note in passing that Munoz's argument that he was not a supervisor directly contradicts his position that he maintained control over

Tankersley—a position taken in order to contest the vehicle search.