# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

NO. 03-06-00717-CR
NO. 03-06-00720-CR
NO. 03-06-00721-CR

**Wendi Mae Davidson, Appellant**

**v.**

**The State of Texas, Appellee**

**FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 51ST JUDICIAL DISTRICT
NOS. A-05-0544-S, A-05-0545-S & A-05-0546-S
HONORABLE THOMAS J. GOSSETT, JUDGE PRESIDING**

## O P I N I O N

Appellant Wendi Mae Davidson was indicted for the murder of her husband Michael Severance and for two counts of tampering with or fabricating physical evidence with intent to impair. *See* Tex. Penal Code Ann. §§ 19.02(b)(1), 37.09 (West 2003). Appellant filed a motion to suppress evidence alleging that the placement and monitoring of a tracking device on her vehicle constituted an unlawful search and therefore violated state statutory requirements and her constitutional rights. *See* U.S. Const. amend. IV; Tex. Const. art. I, § 9; Tex. Code Crim. Proc. Ann. art. 18.21 (West Supp. 2007); Tex. Penal Code Ann. § 16.06 (West 2003). Appellant also asserted that the involvement of Air Force agents in the investigation violated the Posse Comitatus Act. *See* 18 U.S.C. § 1385 (2000). The trial court denied the motion to suppress, and appellant pleaded no contest to all counts. In one issue on appeal, appellant contends that the trial court erred in denying

her motion to suppress evidence obtained from the installation of an electronic tracking device on the undercarriage of her vehicle. For the reasons that follow, we affirm the trial court's order denying appellant's motion to suppress and the judgments of conviction.

**FACTUAL AND PROCEDURAL BACKGROUND**

The evidence at the hearing on appellant's motion to suppress showed the following facts. On January 16, 2005, appellant reported that Michael Severance, her husband and an airman in the United States Air Force stationed at Dyess Air Force Base in Abilene, had been missing since the day before. She advised the security forces section at the Air Force base that he may have deserted his post, possibly fleeing to Canada because he was scheduled to be deployed. Investigators with the Air Force Office of Special Investigations (AFOSI) began a missing persons/deserter investigation. At the request of his superior officer, Officer Dennis McGuire of the San Angelo Police Department began a parallel investigation into appellant's missing persons report and a report that there was a theft of money from appellant's veterinary clinic located in San Angelo.

During the course of their investigation, AFOSI agents interviewed various family members and other friends and acquaintances of appellant and her husband. Although appellant told the agents Severance had talked about deserting or leaving the service, Severance's family members said that deserting would be uncharacteristic of him. The agents conducted a search of the vicinity of appellant's veterinary clinic. On January 24, the agents met with representatives of various law enforcement offices to coordinate their efforts in the missing person investigation. They learned that Terrell Sheen, a local businessman, owned the building where appellant's veterinary clinic was located and knew appellant and her family. AFOSI Special Agent Greg McCormick testified that,

2

early on in the investigation, the agents learned that appellant had "a horse on a ranch," but they did not know the location of the ranch. The agents began researching Sheen's properties to determine if Severance had access to them and might be found there. On January 28, Air Force personnel conducted a ground search of a two-mile radius of the veterinary clinic "cover[ing] possible areas that [Severance] could have walked off to."

During the course of their investigation, AFOSI agents sought and received written approval from the Regional Commander at Langley Air Force Base in Virginia to place a mobile tracking device on appellant's vehicle, which displayed an Air Force sticker allowing entry onto the Air Force base. On February 26, 2005, shortly after midnight, agents placed a tracking device on the exterior undercarriage of appellant's vehicle as it was parked in the parking lot of her veterinary clinic. The device tracked the whereabouts of appellant's vehicle on February 26 and 27. The data retrieved from the device showed that on February 27, appellant's vehicle traveled to a remote location, identified as ranch property owned by Terrell Sheen. The agents contacted Sheen on March 1. Sheen told the agents that appellant and Severance had access to his ranch property and that appellant kept a horse there. Sheen consented to the agents' search of the property.

Based on this additional information and Sheen's consent, on March 3, Sheen gave the agents a tour of the entire ranch property. Sheen also told them that Severance had been to the property and had access to it. Sheen allowed the agents access to all the buildings on the property and showed them various ponds, including a large stock pond with a boat dock. The agents observed that the ranch was gated and locked with a combination lock. There was a lengthy road leading to a barn, mobile homes, fenced corrals, and ponds. Sheen allowed the agents to walk through the mobile homes, barn, and outbuildings. Special Agent McCormick testified that the agents were

3

looking for a missing person: "We went to every place that someone could possibly hide without going through the brush and looking under every rock."

On March 5, 2005, Texas Ranger Shawn Palmer and San Angelo Police Sergeant Jones interviewed appellant at the veterinary clinic. During the interview, the officers asked about the Sheen property, the pond on the property, and about computer searches done on a computer at the clinic, including internet searches on the subjects of polygraphs and "decomposition of a body in water."[1] When the officers asked about the pond, appellant "became more abrupt in her answers . . . [and] got kind of defensive," responding that her parents also had a pond on their property and that Sheen's ranch had three ponds, not just one. After the interview, the officers met with AFOSI agents and other officers in the vicinity. When Palmer noticed appellant's vehicle was no longer parked at the clinic, he asked the AFOSI agents and a police officer to set up surveillance in the vicinity of Sheen's ranch. Palmer testified:

> After interviewing her and discussing this ranch and the pond, I became concerned that there was in fact something in the pond, possibly this missing person, if not evidence of some sort, but she definitely showed some interest in that pond.

When the officers arrived at the ranch, appellant was attempting to enter the gate. A police officer instructed appellant that she could not enter the property because police were securing the premises for a search. After she was denied access, appellant left.

---

[1] The extent and source of information about computer searches conducted at the clinic is not made clear in the record. Palmer testified: "Basically also we discussed there was some computer inquiries done by her, we discussed that, in reference to a polygraph, and then decomposition of a body in water, and then ultimately we discussed the ranch and then a pond located on that ranch."

4

That same day, Marshall Davidson, appellant's brother, contacted San Angelo police officer McGuire, advising him of the possibility that Severance's body could be found in one of the ponds on the Sheen ranch. Davidson requested a meeting. San Angelo police officers, including McGuire, met with Davidson. Appellant and her parents were also present at the meeting. McGuire testified at the hearing that everyone was "pretty upset." During the meeting, Marshall Davidson informed the officers that they should search the pond on Sheen's property. McGuire and Palmer testified that, during the meeting, they heard appellant say to her parents: "I didn't kill him, but somebody did. I thought one of you did it, so I moved the body to protect you." Upon searching the pond on Sheen's property pursuant to Sheen's consent, authorities located Michael Severance's body.

Upon locating Severance's body, AFOSI agents ceased their investigation. San Angelo police and Texas Rangers obtained an arrest warrant for appellant and various search warrants for her clinic, home, computer, and vehicle. Appellant was indicted for the murder of Michael Severance and for two counts of tampering with or fabricating physical evidence with intent to impair. *See* Tex. Penal Code Ann. §§ 19.02(b)(1), 37.09.

***The Motion to Suppress***

Appellant moved to suppress all evidence resulting from the installation and monitoring of the tracking device on her vehicle. After a hearing that included the testimony of five witnesses; the admission of an arrest warrant naming appellant, five search warrants and the affidavits upon which they were based for appellant's clinic, home, computer, and vehicle; and the

5

AFOSI authorization for the tracking device, the trial court denied the motion to suppress. Appellant did not testify. The trial court made the following findings of fact and conclusions of law:

1.     United States Air Force personnel were authorized to place the mobile tracking device on the Defendant's vehicle.

2.     The mobile tracking device was placed on the Defendant's vehicle in accordance with United States Air Force rules and regulations.

3.     There was no search by law enforcement officials in monitoring the tracking device as there is no reasonable expectation of privacy in the observations of Defendant's movements on a public thoroughfare, and therefore no violation of the United States Constitution or the Texas Constitution.

4.     There was no violation of Article 18.21, Texas Code of Criminal Procedure, as the placement of the mobile tracking device was authorized by proper United States Air Force personnel.

5.     Even assuming there was a search, there was adequate attenuation by the statements made to law enforcement by the Defendant's brother in stating that they needed to look in the stock tank because the body was in the tank, and further by Defendant's statements to her parents that she had placed the body in the stock tank.

After the denial of the motion to suppress, appellant pleaded no contest to all charges. The trial court assessed punishment at twenty-five years' imprisonment for the charge of murder and ten years on both of the tampering counts, with the sentences to run concurrently. This appeal followed.

**ANALYSIS**

Appellant contends that the trial court erred in overruling her motion to suppress because her "constitutional rights against unreasonable search and seizure were violated when law

6

enforcement agents illegally installed and used a mobile tracking device on her vehicle on private property and tracked her movement on private land to which she had a reasonable expectation of privacy." Specifically, appellant contends that because a state district judge did not authorize the use of the tracking device, (i) its use was an unreasonable search in violation of the Fourth Amendment of the United States Constitution and Article I, Section 9 of the Texas Constitution, (ii) AFOSI's installation and use of the tracking device to obtain evidence from a search of private land violates section 18.21 of the Texas Code of Criminal Procedure and Texas Penal Code section 16.06, and (iii) therefore, the evidence wrongfully obtained should be suppressed pursuant to article 38.23 of the Texas Code of Criminal Procedure.[2] *See* Tex. Code Crim. Proc. Ann. art. 38.23 (West 2005). Appellant seeks to suppress all evidence that was obtained from the tracking device or discovered as a result of the use of the tracking device.

***Standard of Review and Burden of Proof***

When a defendant seeks to suppress evidence based on a violation of the Fourth Amendment of the United States Constitution or Article I, Section 9 of the Texas Constitution, the burden of proof initially is upon the defendant. *Russell v. State*, 717 S.W.2d 7, 9 (Tex. Crim. App.

---

[2] An issue that contains more than one specific ground of error is a multifarious issue, and we may refuse to consider it. *See, e.g.*, *In re Guardianship of Moon*, 216 S.W.3d 506, 508 (Tex. App.—Texarkana 2007, no pet.); *Sparkman v. State*, 55 S.W.3d 625, 630-31 (Tex. App.—San Antonio 2000, no pet.); *Marcum v. State*, 983 S.W.2d 762, 767 n.1 (Tex. App.—Houston [14th Dist.] 1998, pet. ref'd). We may consider multifarious issues if we can determine, with reasonable certainty, the alleged error about which the complaint is made. *McCain v. State*, 995 S.W.2d 229, 243 n.7 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd). Although appellant's issue is multifarious, we will review her arguments in the interest of justice as we are able to determine the errors about which she complains.

1986); *Carroll v. State*, 911 S.W.2d 210, 215 (Tex. App.—Austin 1995, no writ). As the movant in a motion to suppress evidence, a defendant must produce evidence that defeats the presumption of proper police conduct and shifts the burden to the prosecution. *Russell*, 717 S.W.2d at 9; *Carroll*, 911 S.W.2d at 215. A defendant meets his initial burden by establishing that the search and seizure occurred without a warrant. *Russell*, 717 S.W.2d at 9; *Carroll*, 911 S.W.2d at 215. When the validity of a search is challenged and the State produces a warrant, the defendant must go forward to establish the warrant's invalidity. *Russell*, 717 S.W.2d at 9; *Rumsey v. State*, 675 S.W.2d 517, 520 (Tex. Crim. App. 1984); *Carroll v. State*, 911 S.W.2d at 215.

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review, giving almost total deference to a trial court's determination of historical facts and reviewing *de novo* the court's application of the law. *Carmouche v. State*, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000) (citing *Guzman v. State*, 955 S.W.2d 85, 88-89 (Tex. Crim. App. 1997)). In reviewing the trial court's ruling on a motion to suppress, we view the evidence in the light most favorable to the trial court's ruling. *State v. Kelly*, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006). At a suppression hearing, the trial judge is the sole and exclusive trier of fact and judge of the credibility of the witnesses and their testimony. *Alvarado v. State*, 853 S.W.2d 17, 23 (Tex. Crim. App. 1993); *Allridge v. State*, 850 S.W.2d 471, 492 (Tex. Crim. App. 1991). We uphold the trial court's ruling if it is reasonably supported by the record and is correct under any theory of law applicable to the case. *State v. Steelman*, 93 S.W.3d 102, 107 (Tex. Crim. App. 2002). Absent an abuse of discretion, we will not disturb the trial court's ruling on appeal where the evidence supports the ruling. *Carroll*, 911 S.W.2d at 223. We consider only whether the trial court improperly applied

8

the law to the facts. *Id.* (citing *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)).

***Posse Comitatus Act***

Appellant contends that the involvement of military personnel in this investigation violates the Posse Comitatus Act. *See* 18 U.S.C. § 1385. Appellant asserts that the involvement of AFOSI agents in the investigation of Severance's disappearance "amounted to more than passively coordinating a military investigation with a civilian criminal investigation" and therefore violates the Act. She urges that this violation triggers the application of article 38.23 of the code of criminal procedure, requiring exclusion of any evidence seized as a result of a violation of law. *See* Tex. Code Crim. Proc. Ann. art. 38.23.

The purpose of the Posse Comitatus Act is to uphold the American tradition of restricting military intrusions into civilian affairs, except where Congress has recognized a specific need for military assistance in law enforcement. *See, e.g.*, *United States v. Johnson*, 410 F.3d 137, 146-47 (4th Cir.), *cert. denied*, 546 U.S. 952 (2005); *United States v. Hartley*, 796 F.2d 112, 114 (5th Cir. 1986); *United States v. Walden*, 490 F.2d 372, 375 (4th Cir. 1974). The Act states in full:

> Whoever, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, willfully uses any part of the Army or the Air Force as a posse comitatus or otherwise to execute the laws shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 1385. While the Posse Comitatus Act attempts to maintain the traditional separation between military and civilian law enforcement, it does not prohibit all manner of cooperation or interaction between civilians and the military. *See Johnson*, 410 F.3d at 147 (citing H.R. Rep.

9

No. 97-71, pt. 2, at 3 (1981), *as reprinted in* 1981 U.S.C.C.A.N. 1785, 1792 (discussing Congress'

adoption of the Military Support for Civilian Law Enforcement Agencies Act and Congress' intent

to "maximize the degree of cooperation between military and civilian law enforcement")).

Appellant's claimed violation of the Posse Comitatus Act lacks merit for several

reasons. First, the use of military resources is authorized if there is an independent military purpose

for their involvement. *See, e.g., Applewhite v. United States Air Force*, 995 F.2d 997, 1001

(10th Cir. 1993) ("Since there was an independent military purpose of OSI's conduct, there

was necessarily no willful use of any part of the Air Force as a posse to execute civilian laws.");

*United States v. Chon*, 210 F.3d 990, 994 (9th Cir. 2000) ("Here, however, the NCIS agents'

activities were permissible because there was an independent military purpose for their

investigation—the protection of military equipment."). When the military merely coordinates its

ongoing investigation with civil law enforcement officers, the Posse Comitatus Act is not violated.

*See, e.g., United States v. Griley*, 814 F.2d 967, 976 (4th Cir. 1987).

In this case, appellant reported her husband, a military airman, missing and possibly

a deserter from his military duties. She made the report to the military. The independent military

purpose is to locate a service member who had deserted, a crime under article 85 of the Uniform

Code of Military Justice. *See* 10 U.S.C. § 885 (1998).[3] Article 8 of the Uniform Code of Military

---

[3] Article 85 of the Uniform Code of Military Justice provides for punishment for the offense of desertion:

(a)     Any member of the armed forces who—

  (1)     without authority goes or remains absent from his unit, organization, or place of duty with intent to remain away therefrom permanently;

10

Justice grants civilian authorities the power to apprehend deserters. *See* 10 U.S.C. § 808 (2007); *United States v. Khamsouk*, 57 M.J. 282, 288 (U.S.C.A.A.F. 2002). Thus, there is express authorization for military authorities to investigate deserters as well as to coordinate their activities with civilian authorities. *See* 10 U.S.C. § 808 (providing that any civil officer may summarily apprehend a deserter). At most, appellant's case involved a military/civilian cooperative effort.

Second, the record does not support appellant's contention that the actions of the AFOSI agents amounted to more than passively coordinating a military investigation with a civilian criminal investigation. Testimony of the AFOSI agents amply supports the existence and pursuit of an independent military purpose for the investigation. Commander Archibald Harner testified that appellant reported her husband missing to military authorities on January 16.[4] Appellant told the agents that her husband may have deserted, that he did not like being in the military, and that he intended to leave the service to avoid an upcoming deployment. She told them that Severance had "mentioned how easy it would be to disappear to Canada." The agents searched for him as a

---

      (2)     quits his unit, organization, or place of duty with intent to avoid hazardous duty or to shirk important service . . .

is guilty of desertion.

* * *

      (c)     Any person found guilty of desertion or attempt to desert shall be punished . . . as a court martial shall direct.

10 U.S.C. § 885 (1998).

[4] There is also evidence that appellant reported her husband missing to the San Angelo Police Department, also alleging that there was some money stolen from appellant's veterinary clinic.

missing person and possible deserter until Severance's body was recovered and their investigative involvement then ceased. Special Agent McCormick testified that the military and law enforcement authorities searched the premises of the Sheen ranch looking for a missing person, possibly someone who had gone AWOL or deserted. The Request for Authorization for Use of Non-Consensual Tracking Device submitted to the Commander of the AFOSI of the Department of the Air Force on February 18 specified the purpose of the device was to ascertain the location where the "incidental" "may be harboring, concealing, protecting, or assisting subject in his desertion from service." That the investigation evolved into a criminal investigation does not mean that it did not have an original military purpose or that it was a subterfuge for a civilian investigation. In any event, because appellant set the military's investigation in motion, appellant is estopped from complaining that there was one. *See Jones v. State*, 119 S.W.3d 766, 784 (Tex. Crim. App. 2003).

Moreover, no violation of the Posse Comitatus Act occurred here. The trial court found that the military authorities were authorized to place the tracking device on appellant's vehicle and that it was placed on the vehicle in accordance with Air Force rules and regulations. The military investigators obtained permission to use the tracking device after briefing their staff judge advocate, who consulted with the United States Attorney, and applying for approval with their Regional Commander. The evidence showed that the installation of the tracking device was authorized by a Regional Commander of the United States AFOSI pursuant to its procedures. The Commander reviewed the information contained within the four corners of the request for authorization and granted the request. Agent Harner testified that appellant's red Camaro vehicle displayed a Dyess Air Force Base sticker on its windshield, allowing her access to the base and its services and subjecting appellant to its regulations. The Request iterates that approval authority

12

under military rules "only requires a Region commander's approval" and that "no search warrant or search authorization is required as long as the installation and monitoring of the device is conducted in a public area." The trial court expressly found that the agents fully complied with Air Force rules and regulations. Appellant does not contend that the military violated any specific procedure or rule in obtaining approval for and installing the tracking device. She claims only that military personnel were required to comply with the warrant requirements of the Texas Code of Criminal Procedure.[5] As commander of AFOSI at Dyess Air Force Base, Commander Harner made a proper request for the approval and installation of the tracking device, which was approved by the regional commander, Colonel Edward Hagerty. Given the grant of legislative authority, the AFOSI investigation constituted an independent military purpose conducted in accordance with military procedures and regulations and was, therefore, not in violation of the Posse Comitatus Act.

Finally, as the movant in the motion to suppress evidence, appellant was required to produce evidence defeating the presumption of proper police conduct. *Russell*, 717 S.W.2d at 9. When the State produced evidence of the request for authorization of the installation of the device by Commander Harner and its approval by USAF Colonel Hagerty, the burden was on appellant to show evidence of its invalidity. *Id*. This appellant failed to do.[6] Appellant does not direct our

---

[5] To the extent appellant now challenges the rules or regulations pursuant to which the agents sought approval, this issue is waived as it was not presented in the court below. In addition, appellant does not challenge the authority of the AFOSI agents to install the device on appellant's vehicle except to the extent they failed to seek the approval of a state district court.

[6] Although appellant argued at the hearing that Colonel Hagerty does not have the authority of a base commander who does have "magistrate status," she adduced no evidence to that effect. It would follow from this argument that appellant acknowledges that some military authority has the authority to grant the request.

attention to any violation of military law, and the trial court found that the authorization was properly obtained and that there was no violation of military law.

Even if we were to find a violation of the Posse Comitatus Act, there is no remedy available to appellant in this context. As a general matter, a violation of the Posse Comitatus Act does not trigger the application of the exclusionary rule. *Johnson*, 410 F.3d at 149 (exclusionary rule not a remedy for violations of the Act); *United States v. Al-Talib*, 55 F.3d 923, 930 (4th Cir. 1995); *Griley*, 814 F.2d at 976; *United States v. Wolffs*, 594 F.2d 77, 85 (5th Cir. 1979) (holding that application of an exclusionary rule in regards to a violation of the Act was not an appropriate remedy, but that future widespread and repeated violations could require creating an exclusionary rule). To the extent appellant contends exclusion was required under article 38.23, appellant cites no authority for this proposition, and we have found none.[7] This result comports with the Supreme Court's command to restrict application of the exclusionary rule to "those areas where its remedial objectives are thought most efficaciously served." *United States v. Calandra*, 414 U.S. 338, 348 (1974). We conclude that the trial court did not abuse its discretion in finding that the authorization of the military personnel was valid and in denying the motion to suppress.

*Article 18.21*

Appellant nevertheless contends that, because they "piggy-backed" on the military

---

[7] Instead, section 16.06 of the Texas Penal Code provides the available remedy by allowing prosecution when a "person knowingly installs an electronic or mechanical tracking device on a motor vehicle owned or leased by another person." Tex. Penal Code Ann. § 16.06 (West 2003). It also specifies affirmative defenses, including a defense for a peace officer who installed the device in the course of his law enforcement duties. *Id.* § 16.06(d).

14

personnel's application and installation of the tracking device, the civil law enforcement authorities "in collusion with" the AFOSI agents bypassed the requirement of a judicial order. *See* Tex. Code Crim. Proc. Ann. art. 18.21. Appellant asserts that AFOSI's failure to seek a judicial order from a state district court violated the express provisions of article 18.21. Appellant's reliance on article 18.21 is misplaced.

Article 18.21 establishes procedures for acquiring judicial orders for, *inter alia*, the use of pen registers, trap and trace devices, and for the installation and use of mobile tracking devices. *See id.* Section 14 of article 18.21 limits the power to order the placement of mobile tracking devices to state district judges and only upon the request of an authorized peace officer. *Id.* art. 18.21, § 14. "Authorized peace officer" is defined in section 1(2)(A) of article 18.21 to include a list of peace officers that are exclusively state officers. *Id.* art. 18.21, § 1(2)(A). Through this limitation to state officers, article 18.21 does not purport to govern orders to place tracking devices by non-state actors, such as federal agents. *See State v. Toone*, 872 S.W.2d 750, 752 (Tex. Crim. App. 1994) (holding that article 18.01 does not govern federal search warrants).[8] We reject appellant's argument and hold that the installation was not barred by article 18.21.

It is well established that evidence obtained by federal agents acting lawfully and in conformity with federal authority is admissible in state criminal proceedings. *State v. Toone*, 823 S.W.2d 744, 748 (Tex. App.—Dallas 1992) ("protections afforded by the constitution of a sovereign entity control the actions only of the agents of that sovereign entity"), *aff'd on other*

---

[8] Because article 18.21 does not apply to the AFOSI agents in this case, we need not reach whether failure to utilize the process provided by article 18.21, section 14 is itself a violation of article 18.21. *See* Tex. Code Crim. Proc. Ann. art. 18.21, § 14 (West Supp. 2007).

15

*grounds*, 872 S.W.2d 750 (Tex. Crim. App. 1994). But appellant is correct when she argues that federal agents may not act as agents of the state police to circumvent the requirements of state law. *See Toone*, 823 S.W.2d at 748 (citing *State v. Mollica*, 554 A.2d 1315, 1329 (N.J. 1989)). If military personnel are not acting pursuant to the special powers granted them under federal law to pursue their independent military purpose and are instead acting as agents for the state police, they are subject to the same statutes and constitutional standards as state officers. *See id.*; *Lockett v. State*, 879 S.W.2d 184, 190 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd). Where an operation involves actors from various jurisdictions then, as here, the relationship must be examined to determine whether federal agents are acting so as to circumvent the requirements of state law. *See Lockett*, 879 S.W.2d at 190; *Toone*, 823 S.W.2d at 748; *Mollica*, 554 A.2d at 1329. As stated by the *Toone* court:

> Evidence of antecedent mutual planning, joint operations, cooperative investigations, or mutual assistance between federal and state officers may sufficiently establish agency and serve to bring the conduct of the federal agents under the color of state law. Conversely, mere contact, awareness of ongoing investigations, or the exchange of information may not transform the relationship into one of agency.

*Toone*, 823 S.W.2d at 748.[9]

Not every joint operation between state and federal actors results in an agency

---

[9] Likewise, commentators have observed: "If a showing were made that Texas law enforcement officers solicited action by federal or other officers that would violate Texas 'law' if taken by the Texas officers, the action of those other officers might well be regarded as that of the soliciting Texas officers. Thus it would probably be tested under Texas law—including Chapter 18 of the Code—and if it is found to violate that law, the products would most likely be inadmissible under article 38.23." 40 George E. Dix & Robert O. Dawson, *Texas Practice: Criminal Practice and Procedure* § 4.68 n.7 (2d ed. 2001).

16

relationship so as to bring federal agents under the color of state law. Federal agents, including military personnel, often work in conjunction with other law enforcement authorities to achieve federal objectives, and such cooperation should not be discouraged. It is the attempt by state officers to do indirectly what their statutes or constitution prohibits them from doing directly, by using federal agents to circumvent these requirements, that is prohibited. *See Shurman v. United States*, 219 F.2d 282, 287-88 (5th Cir. 1955) (evidence admissible where there was not such cooperation between federal agents and state police as to demonstrate an attempt by federal authorities to circumvent Fourth Amendment); *Mollica*, 554 A.2d at 1328 (essential objective of state exclusionary rule is to deter unlawful state police conduct and thus no deterrence value for state officials is frustrated by admitting evidence seized by federal officers under authority of, and in conformity with, federal law). Thus, state officers may not use military personnel to obtain evidence indirectly that they could not obtain directly in a lawful manner.

Here, although the original military investigation evolved into a state criminal investigation, it began as a report by appellant that her husband was missing and absent without leave. Appellant told the AFOSI agents that her husband may have deserted, that he did not like being in the military, and that he intended to leave the service to avoid an upcoming deployment. She told them that Severance had "mentioned how easy it would be to disappear to Canada." It was appellant herself who set the military apparatus in motion. Given the independent military reason for AFOSI's investigation, the military was entitled to employ its investigative tools to accomplish the limited purpose of locating a serviceman reported missing and characterized as a possible deserter by his spouse.

17

The trial court found that military personnel were authorized to place the tracking device on appellant's vehicle and followed their appropriate rules and regulations.[10] A review of the evidence, giving deference to the trial court's factual findings and viewing the remaining facts in a light most favorable to the trial court's ruling, shows that the military personnel pursued its independent investigative purpose and did not improperly serve as agents of the civilian law enforcement authorities to circumvent appellant's statutory or constitutional rights as prohibited under *Toone*. Further, appellant did not adduce evidence or demonstrate in any manner that the law enforcement officers did indirectly through the AFOSI agents what they were prohibited from doing directly in order to circumvent state statutory requirements. *See Shurman*, 219 F.2d at 288.

The trial court correctly found that article 18.21 does not apply to the AFOSI agents and that the placement of the tracking device on appellant's vehicle was not a violation of that statute. No Texas statute governs the use of tracking devices by federal agents and, apart from what the constitution may require, the conduct of the agents in attaching and monitoring the device was not contrary to article 18.21. But the trial court also found that the tracking device was placed on appellant's vehicle in accordance with Air Force rules and regulations. Appellant did not challenge below in what respect the military personnel failed to follow any of its procedures and may not raise this challenge for the first time on appeal. *See* Tex. R. App. P. 33.1.[11]

---

[10] Appellant does not distinguish between the monitoring of various tracking devices, such as "beepers" and GPS devices, and we therefore need not address any similarities or differences between them for the purposes of our discussion here.

[11] In a single sentence of her brief, appellant argues that section 16.06 of the penal code "makes it a Class A misdemeanor to unlawfully install such a device upon another's vehicle." To the extent this sentence can be construed to argue that a violation of section 16.06 has occurred, we consider this claim waived by appellant's failure to properly brief it. *See* Tex. R. App. P. 38.1.

***State and Federal Constitutional Provisions***

The issue on which the lawfulness of the remaining conduct turns, then, is whether the monitoring of the tracking device was violative of appellant's rights under the Fourth Amendment of the United States Constitution or Article I, Section 9 of the Texas Constitution.[12] Although the evidence appellant sought to suppress is not entirely clear, in her brief on appeal, she states that "[b]ased on information obtained through the use of the tracking device, Special Agent Harner determined routine areas of travel for Ms. Davidson's vehicle as well as one location he described as 'way outside that area to a remote location.'" From that information, Agent Harner learned that the property to which the vehicle was driven was owned by Sheen. Sheen advised the agents that appellant had access to the property and kept a horse there.

Appellant acknowledges that she cannot challenge the fact that the agents tracked her car while it was on public streets.[13] *See, e.g.*, *United States v. Knotts*, 460 U.S. 276, 281-82 (1983); *Nored v. State*, 875 S.W.2d 392, 395 (Tex. App.—Dallas 1994, pet. ref'd). Rather, appellant argues that, by tracking her vehicle "onto private land, not visible from the public road, and to which she

---

[12] Appellant does not argue that Article I, Section 9 of the Texas Constitution offers greater protection to the individual than the Fourth Amendment of the United States Constitution. *See, e.g.*, *Westfall v. State*, 10 S.W.3d 85, 88 (Tex. App.—Waco 1999, no pet.). We will therefore address these claims together. *See Hulit v. State*, 982 S.W.2d 431, 436 (Tex. Crim. App. 1998); *Heitman v. State*, 815 S.W.2d 681, 690 (Tex. Crim. App. 1991).

[13] She states, "Appellant acknowledges that the United States Supreme Court has held that monitoring of mobile tracking devices does not implicate the Fourth Amendment when a citizen's movements are monitored in public places and on public roadways." Because there is no expectation of privacy when traveling in an automobile on public thoroughfares to the entrance of the Sheen property, we hold that the trial court properly concluded that the tracking of appellant's vehicle to the location of the Sheen property did not violate state or federal constitutional provisions. *See United States v. Knotts*, 460 U.S. 276, 281-82 (1983).

19

had a reasonable expectation of privacy," the AFOSI agents violated her constitutional rights. She claims that the agents monitored the tracking device as she drove through the Sheen property and thereby identified a stock pond located on the ranch property where the law enforcement authorities eventually found Severance's body.

Relying on *United States v. Karo*, 468 U.S. 705 (1984), appellant argues that the evidence obtained from the monitoring of the tracking device on private land is evidence discovered as a result of an illegal search and that it should be excluded as "fruit of the poisonous tree." But appellant's reliance on *Karo* is misplaced. In *Karo*, the Court limited its prior holding in *Knotts* when it held that it was a violation of the Fourth Amendment for the government to monitor a warrantless tracking device while it was inside a person's private residence. 468 U.S. at 714-15. In contrast to the facts of *Karo*, AFOSI agents were not monitoring the movements of appellant's vehicle inside a private residence. Appellant has cited no authority—and we have found none—that would extend the holding of *Karo* to the monitoring of a tracking device in the open fields under the circumstances presented here.

The purpose of both the Fourth Amendment and Article I, Section 9 "is to safeguard an individual's legitimate expectation of privacy from unreasonable governmental intrusions." *Richardson v. State*, 865 S.W.2d 944, 948 (Tex. Crim. App. 1993). An accused has standing, under both constitutional provisions, to challenge the admission of evidence obtained by a governmental intrusion only if he had a legitimate expectation of privacy in the place invaded. *Rakas v. Illinois*, 439 U.S. 128, 143 (1978); *Fuller v. State*, 829 S.W.2d 191, 202 (Tex. Crim. App. 1992). The burden of proving facts establishing a legitimate expectation of privacy rests with the accused. *Calloway*

*v. State*, 743 S.W.2d 645, 650 (Tex. Crim. App. 1988).  The burden to establish standing rests on the party seeking to exclude the evidence.  *Kothe v. State*, 152 S.W.3d 54, 60 (Tex. Crim. App. 2004); *Villarreal v. State*, 935 S.W.2d 134, 138 (Tex. Crim. App. 1996); *State v. Klima*, 934 S.W.2d 109, 110 (Tex. Crim. App. 1996).  To carry this burden, a defendant must demonstrate (i) he had an actual, subjective expectation of privacy, and (ii) the subjective expectation of privacy is one that society is prepared to recognize as objectively reasonable.  *Smith v. Maryland*, 442 U.S. 735, 740-41 (1979); *Villarreal*, 935 S.W.2d at 138.

To determine whether an accused's subjective expectation was one that society was prepared to recognize as objectively reasonable, a court may consider several factors, including: (1) whether the accused had a property or possessory interest in the place invaded; (2) whether he was legitimately in the place invaded; (3) whether he had complete dominion or control and the right to exclude others; (4) whether, before the intrusion, he took normal precautions customarily taken by those seeking privacy; (5) whether he put the place to some private use; and (6) whether his claim of privacy is consistent with historical notions of privacy.  *Calloway*, 743 S.W.2d at 651.  Whether a defendant has standing to contest a search and seizure is a question of law we review *de novo*.  *Parker v. State*, 182 S.W.3d 923, 925 (Tex. Crim. App. 2006).  The question of whether appellant's subjective expectation of privacy was one that society was prepared to recognize as reasonable is also a question of law.  *Villarreal*, 935 S.W.2d at 128.

Viewing the record evidence and all reasonable inferences therefrom in the light most favorable to the trial court's ruling, we cannot say that the trial court abused its discretion in finding that there was no reasonable expectation of privacy and that appellant failed to establish standing.

21

We will assume—as appellant has argued—that the property to which she claims an expectation of privacy and was invaded by virtue of the tracking device is "land, in an area not visible from the public road, to which the public did not have access that the officers ultimately recovered the body of Michael Severance." Appellant contends that she has a reasonable expectation of privacy because (i) the property was behind a locked gate, (ii) appellant had access to the land with the express consent of the owner of the land, (iii) "she and the owner had excluded members of the public from that land with fencing and a locked gate," and (iv) she kept a horse on the property.

But the evidence does not establish that appellant had a reasonable expectation of privacy. The evidence showed only that appellant and Severance had access to property with a locked gate owned by Terrell Sheen and that appellant maintained a horse on the property. There is nothing in the record that showed where the horse was maintained or to what portion of the property appellant had access and the terms of the access. Officer McCormick testified that Sheen "told us that she kept a horse out on the property" and that she had access to the property. The evidence demonstrated that appellant was no more than a casual visitor to the property.

As in *Villarreal*, there is nothing in the record here to show that appellant had a property or possessory interest, unrestricted access, complete dominion and control, the right to exclude others, or any other expectations of privacy in the property that were of the types that society views as objectively reasonable. *See id.* Nor was there any evidence that appellant intended to or had stayed overnight. *See id.* At best, appellant's evidence addresses one of the six relevant factors to be considered—that she had legitimate presence in the place searched. *See id.* Appellant's mere assertion in her brief that she *and Sheen* excluded the public from the land with fencing and a locked

22

gate does not satisfy her burden to prove a legitimate expectation of privacy in Sheen's ranch. As in *Villarreal*, appellant presented no evidence that she was anything other than a guest with indeterminate access to the property. *See id.* The evidence did not establish that appellant's subjective expectation of privacy was one that society was prepared to recognize as objectively reasonable under the circumstances.

In any event, the government's intrusion upon the open fields is not one of those "unreasonable searches" proscribed by the Fourth Amendment or Article I, Section 9. The Fourth Amendment and Article I, Section 9 accord special protection to people in their persons, houses, papers, and effects, but that protection does not extend to "open fields."[14] *Oliver v. United States*, 466 U.S. 170, 178-79 (1984); *Hester v. United States*, 265 U.S. 57, 59 (1924); *Westfall v. State*, 10 S.W.3d 85, 89 (Tex. App.—Waco 1999, no pet.); *Carroll*, 911 S.W.2d at 217; *White v. State*, 890 S.W.2d 131, 134 (Tex. App.—Texarkana 1994, no pet.). The "open fields" doctrine allows a law enforcement officer to enter and search an area of land without a warrant. *Carroll*, 911 S.W.2d at 217; *Rosalez v. State*, 875 S.W.2d 705, 713 (Tex. App.—Dallas 1993, pet. ref'd). An "open field" need not be "open" or a "field" as those terms are commonly used; the term "open field" may be defined as any unoccupied or undeveloped area outside the curtilage of a dwelling. *Westfall*, 10 S.W.3d at 89; *Rosalez*, 875 S.W.2d at 714 (citing *Oliver*, 466 U.S. at 180 n.11). An individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the

---

[14] Texas courts have upheld the application of the "open fields" doctrine. *See Carroll v. State*, 911 S.W.2d 210, 217 (Tex. App.—Austin 1995, no pet.); *Beasley v. State*, 683 S.W.2d 132, 133 (Tex. App.—Eastland 1984, pet. ref'd); *see also Leal v. State*, 736 S.W.2d 907, 909 (Tex. App.—Corpus Christi 1987), *pet. dism'd*, 773 S.W.2d 296 (Tex. Crim. App. 1989).

area immediately surrounding the home, *i.e.*, the curtilage. *Oliver*, 466 U.S. at 178.[15] As Justice

Holmes explained in *Hester v. United States*, "[T]he special protection accorded by the Fourth

Amendment to the people in their 'persons, houses, papers, and effects,' is not extended to the open

fields. The distinction between the latter and the house is as old as the common law." 265 U.S. at

59. In contrast to the "sanctity of the home," the Supreme Court recognized in *Oliver* that the "open

fields do not provide the setting for those intimate activities that the [Fourth] Amendment is intended

to shelter from government interference or surveillance." *Oliver*, 466 U.S. at 179. The Court

reasoned:

> There is no societal interest in protecting the privacy of those activities, such as the cultivation of crops, that occur in open fields. Moreover, as a practical matter these lands usually are accessible to the public and the police in ways that a home, an office, or commercial structure would not be. It is not generally true that fences or 'No Trespassing' signs effectively bar the public from viewing open fields in rural areas. And both [parties] concede that the public and police lawfully may survey lands from the air. For these reasons, the asserted expectation of privacy in open fields is not an expectation that 'society recognizes as reasonable.'

*Id*. The Court distinguished the "open fields" of "the vast expanse of some western ranches" or

woods from the "curtilage," the land immediately surrounding and associated with the home. *Id.*;

*see also Rosalez*, 875 S.W.2d at 714. The Court concluded that "from the text of the Fourth

Amendment and from the historical and contemporary understanding of its purposes, that an

individual has no legitimate expectation that open fields will remain free from warrantless intrusion

by government officers." *Id.* at 225-26.

---

[15] The Fourth Amendment does protect the curtilage of a home. *See United States v. Dunn*, 480 U.S. 294, 300 (1987).

Appellant failed to present any evidence during the suppression hearing to demonstrate that the monitoring of her vehicle implicated a reasonable expectation of privacy. The evidence at the hearing showed that the rural ranch property in question falls squarely within the definition of "open fields" in which appellant is not entitled to an expectation of privacy. That the property was fenced and gated does not create an expectation of privacy that society recognizes as legitimate and reasonable. *See Oliver*, 466 U.S. at 178; *Westfall*, 10 S.W.3d at 90; *Carroll*, 911 S.W.2d at 218; *Rosalez*, 875 S.W.2d at 719.

The trial court's ruling on appellant's motion to suppress is supported by the record and is correct on a theory of law applicable to the case. Accordingly, finding no misapplication of the law to the facts by the trial court, we hold that the trial court did not abuse its discretion in denying appellant's motion to suppress.[16]

## CONCLUSION

Because the AFOSI agents had an independent military purpose for their investigation, they did not violate the Posse Comitatus Act and were authorized to and did comply with their rules and regulations to install and monitor the tracking device. The record does not show that the trial court abused its discretion in determining that the police did not violate appellant's reasonable expectation of privacy by monitoring the tracking device on Sheen's property and the

---

[16] The State argued alternatively at the suppression hearing, and the trial court found, that even if the installation and monitoring of appellant's vehicle violated appellant's rights, there was adequate attenuation to preclude the exclusion of evidence. Because we have concluded there was no violation of appellant's constitutional or statutory rights, we need not reach the question of attenuation.

evidence obtained through use of the device was properly admitted. Having overruled appellant's sole issue, we affirm the trial court's order denying appellant's motion to suppress and the judgments of conviction.

_____

Jan P. Patterson, Justice

Before Justices Patterson, Puryear and Pemberton

Affirmed

Filed: March 13, 2008

Publish