In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-08-00030-CR


______________________________




BRIAN KEITH MCALLISTER, Appellant



V.



THE STATE OF TEXAS, Appellee




 


On Appeal from the Fourth Judicial District Court


Rusk County, Texas


Trial Court No. CR08-014-2




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Carter



MEMORANDUM OPINION



 Brian Keith McAllister was convicted of theft of copper wire stripped from electric poles in
Rusk County. At trial, he moved to suppress all evidence gathered as the result of a consensual
search made after the stop of a vehicle in which he was a passenger--and during the course of which
officers found a substantial amount of copper wire. His sole claim on appeal asserts that the trial
court's denial of his motion to suppress was error because the law enforcement officer did not have
reasonable suspicion for the initial stop of the vehicle. We disagree. 

I. Ruling on Motion to Suppress is Reviewed for an Abuse of Discretion

 Since the trial court was the sole and exclusive trier of fact at the suppression hearing, we
will not set aside the denial of McAllister's motion to suppress evidence absent a showing of abuse
of discretion. Guzman v. State, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); Maddox v. State, 682
S.W.2d 563, 564 (Tex. Crim. App. 1985); Jackson v. State, 968 S.W.2d 495, 498 (Tex.
App.--Texarkana 1998, pet. ref'd) (citing Villarreal v. State, 935 S.W.2d 134, 138 (Tex. Crim. App.
1996)). Thus, we will afford almost total deference to the trial court's determination of the historical
facts in this case. Carmouche v. State, 10 S.W.3d 323, 327 (Tex. Crim. App. 2000); Jackson, 968
S.W.2d at 498. If the determination was reasonably supported by the record, and was correct under
any theory of law applicable to the case, we are not at liberty to disturb the trial court's findings. 
State v. Steelman, 93 S.W.3d 102, 107 (Tex. Crim. App. 2002); Romero v. State, 800 S.W.2d 539,
543 (Tex. Crim. App. 1990); Etheridge v. State, 903 S.W.2d 1, 15 (Tex. Crim. App. 1994); State v.
Hopper, 842 S.W.2d 817, 819 (Tex. App.--El Paso 1992, no pet.). Therefore, instead of engaging
in a factual review of the record, we will view the evidence in a light most favorable to the trial
court's ruling to decide only whether the trial court improperly applied the law to the facts. State v.
Kelly, 204 S.W.3d 808, 818 (Tex. Crim. App. 2006); Romero, 800 S.W.2d at 543. 

 The pertinent facts are as follows: on November 10, 2007, Fay McElroy, a dispatcher for the
Rusk County Sheriff's Department, received an emergency call from a Rusk County Electric
Cooperative employee identifying herself as "Linda." Linda reported that copper wire was stolen
from electric poles located on 1249 County Road 288 the previous week. She said that the thief had
risked his life, climbed up an electric pole that morning, and cut down a live electric copper wire,
resulting in a power outage to residents in the area. Linda called 9-1-1 dispatch the following
morning and asserted that a member of the cooperative saw a suspicious "red Ford Taurus with two
men in it" on County Road 292. She asked the 9-1-1 operator to dispatch officers to interview the
witnesses. 

 McElroy testified that after Deputy Kevin Roy spoke to the witness, a Rusk County Electric
Cooperative representative, he advised the vehicle was a red Ford hatchback. McElroy then sent a 
be-on-the-lookout (BOLO) broadcast to all officers in the vicinity: 

They just talked to one of the witnesses out there. The suspect or the suspicious
vehicle out there is going to be an 80s or a 90s model red ford hatchback. It's going
to be occupied by two white males possibly in their 20s. Also a blue over silver
possibly an S-10 pickup occupied by a white female. The witnesses advised that he
saw them turn off of a -- going 1249 north going towards 292. 

 

Deputy James Charlo received the BOLO and was dispatched to County Road 288. Approximately
an hour to an hour and a half later, he observed a red Ford hatchback containing two white males on
County Road 292 traveling northbound. (1) Charlo initiated the stop less than a mile away from the
location where the copper wire was cut. 

 Charlo could smell the odor of alcoholic beverages emanating from driver Joshua Kee as
soon as he approached him. Charlo observed an open container of Busch beer on the floorboard of
the backseat and asked Kee to step out and walk to the rear of the Ford hatchback. Charlo told Kee
that he initiated the stop to investigate the theft of copper wire from the area. Kee stated there was
copper wire in the trunk that belonged to McAllister. Kee claimed he was asked to help McAllister
transport the copper wire to Gregg County to get it recycled in exchange for gas and beer money. 
He also admitted that there were two crack pipes that belonged to him and McAllister in the Ford
console. 

 Charlo then asked passenger McAllister to exit the Ford and began questioning him about
the copper wire. McAllister said he cut the wire from an abandoned house and intended to take it
to Gregg County for recycling. After obtaining Kee's consent to search the vehicle, Charlo recovered
the copper wire, crack pipes, and open container of Busch beer. Kee and McAllister were placed
under arrest. In a videotaped confession, McAllister admitted to the crime of theft of copper wire.


II. Shifting Burden During Motion to Suppress

 The Fourth Amendment to the United States Constitution protects "the right of the people
to be secure in their persons, houses, papers, and effects, against unreasonable searches and
seizures." U.S. Const. amend. IV. Charlo's detention of McAllister and seizure of the copper wire
amounts to a sufficient intrusion on McAllister's privacy to implicate Fourth Amendment
protections. Terry v. Ohio, 392 U.S. 1, 16 (1968); Carmouche, 10 S.W.3d at 328. If Charlo
conducted a search or seizure in an unreasonable fashion, the fruits from his search or seizure must
be suppressed. Wong Sun v. United States, 371 U.S. 471, 479-84 (1963); Davis v. State, 947 S.W.2d
240 (Tex. Crim. App. 1997). 

 The presumption of proper police conduct is a well-recognized principle of criminal
jurisprudence. Gaines v. State, 888 S.W.2d 504, 508 (Tex. App.--El Paso 1994, no pet.). In order
to shift the burden of reasonable conduct to the State, McAllister was initially required to produce
evidence to defeat the presumption that Charlo acted properly. Ford v. State, 158 S.W.3d 488, 492
(Tex. Crim. App. 2005); Davison v. State, 249 S.W.3d 709, 717-18 (Tex. App.--Austin 2008, no
pet.) (citing Russell v. State, 717 S.W.2d 7, 9 (Tex. Crim. App. 1986)). To accomplish this,
McAllister needed to show that a search or seizure occurred without a warrant in violation of his own
Fourth Amendment rights. Simmons v. United States, 390 U.S. 377, 389-90 (1968); Gaines, 888
S.W.2d at 508. Because it was undisputed that the search and seizure occurred without a warrant,
the only question is whether Charlo's initial stop and detention, and the resulting search and seizure,
were reasonable under the totality of the circumstances existing at the time. See Ford, 158 S.W.3d
at 492. 

III. Officer Charlo had Reasonable Suspicion to Detain McAllister 

 An arrest occurs when a person is actually placed under restraint or when he or she is taken
under custody. Tex. Code Crim. Proc. Ann. art. 15.22 (Vernon 2005). Because a person's liberty
of movement is restricted or constrained during an arrest, probable cause to justify the intrusion is
required. Hoag v. State, 728 S.W.2d 375, 379 (Tex. Crim. App. 1987). To contrast, due to the
principle that law enforcement interests logically warrant a limited intrusion on the personal security
of suspects, federal and state jurisprudence readily recognizes that law enforcement officers may stop
and briefly detain persons suspected of criminal activity on less information than is constitutionally
required for probable cause to arrest. United States v. Brignoni-Ponce, 422 U.S. 873 (1975); Terry,
392 U.S. at 22; Davis, 947 S.W.2d at 243-44. Thus, a temporary detention based on the totality of
the circumstances that objectively supports a reasonable suspicion that the person detained actually
is, has been, or soon will be engaged in criminal activity does not violate the Fourth Amendment.
United States v. Hensley, 469 U.S. 221, 229 (1985); Terry, 392 U.S. at 25-26; Garcia v. State, 43
S.W.3d 527, 530 (Tex. Crim. App. 2001); Woods v. State, 956 S.W.2d 33, 37-39 (Tex. Crim. App.
1997); Davis, 947 S.W.2d at 243-44. 

 The question of whether Charlo was required to have probable cause or reasonable suspicion
turns on whether his halt of the driver of the Ford hatchback was an arrest or an investigative stop. 
 McAllister relies heavily on the case of Amores v. State throughout his briefing for the proposition
that Charlo did not have reasonable justification to stop the driver of the red Ford hatchback. 816
S.W.2d 407 (Tex. Crim. App. 1991). His reliance is mistaken. Amores involved the question of
whether the officers had probable cause to effectuate an arrest. Id. at 411. In Amores, officers
blocked the defendant's vehicle with their patrol car, ordered him out of the car at gunpoint, told him
to lie face down in the parking lot with his hands behind his head, and threatened to shoot him if he
did not cooperate. Id. at 410. The Texas Court of Criminal Appeals rightfully concluded that the
officers' actions amounted to an arrest because the defendant's liberty of movement was restricted. 
Id. at 411. Here, Charlo stopped Kee's red Ford hatchback based on the dispatcher's broadcast to
briefly question him about the theft. While the vehicle was stopped, and during the time Kee was
being questioned outside of the vehicle, McAllister was seated inside the car. He was not restrained
or in custody. His freedom of movement was not restricted. His arrest occurred after Charlo found
the copper wire in the vehicle, an event giving rise to probable cause for an arrest. We conclude
Charlo's actions in stopping the vehicle amounted to a temporary detention for which only reasonable
suspicion was required. 

 The United States Supreme Court adopted a dual inquiry that will aid us in determining
whether  Charlo's  actions  were  reasonable:  (1)  were  his  actions  justified  at  their  inception;
and, (2) were his actions reasonably related in scope to the circumstances that justified the
interference of criminal activity. Terry, 392 U.S. at 19-20; Davis, 947 S.W.2d at 242. Under the
first prong, Charlo must "point to specific and articulable facts, which, taken together with rational
inferences from those facts, reasonably warrant [the] intrusion" into McAllister's privacy. Terry, 392
U.S. at 21; Carmouche, 10 S.W.3d at 328; Davis, 947 S.W.2d at 242-43. These facts must amount
to more than a mere hunch or suspicion. Williams v. State, 621 S.W.2d 609, 612 (Tex. Crim. App.
1981). "[W]hen used by trained law enforcement officers, objective facts, meaningless to the
untrained, can be combined with permissible deductions from such facts to form a legitimate basis
for suspicion of a particular person . . . ." Woods v. State, 956 S.W.2d 33, 37-38 (Tex. Crim. App.
1997). 

 Here, Charlo testified he based his stop of Kee's vehicle solely on the BOLO broadcast. When
the broadcast was received, Charlo had the right to act on the basis of the dispatch and was entitled
to assume the officer requesting the arrest had sufficient cause to justify the stop or arrest. Colston
v. State, 511 S.W.2d 10, 12 (Tex. Crim. App. 1974); Weeks v. State, 417 S.W.2d 716, 718 (Tex.
Crim. App. 1967) (if officer who initiates request for arrest is in possession of sufficient knowledge
to constitute probable cause, then he or she may transmit to officer who makes arrest only such
information as is necessary for that officer to know who is wanted). The real test is whether the
requesting officer was in possession of sufficient knowledge to constitute reasonable suspicion.
Weeks, 417 S.W.2d at 718. 

 A police broadcast may be sufficient to provide an officer with reasonable suspicion to stop
persons matching a description for investigatory purposes if based on reliable information furnished
by an otherwise credible private citizen whose only contact with the police results from having
witnessed a criminal act. Gaines, 888 S.W.2d at 507, 509 (description of "two black men" "driving
a yellow Honda Civic automobile" who robbed an office located at a particular address amounted
to reasonable suspicion justifying the stop of two black men driving a yellow Honda Civic); Brown
v. State, 443 S.W.2d 261, 262 (Tex. Crim. App. 1969) (description of witness of three young black
men in a 1959 blue and white Oldsmobile heading in the direction of Odessa was sufficient to justify
stop of the Oldsmobile to confirm whether suspects robbed a jewelry store); Lesco v. State, No. 01-98-01168-CR, 1999 WL 343425 (Tex. App.--Houston [1st Dist.] May 27, 1999, no pet.) (mem. op.,
not designated for publication) (based on description that two intoxicated white men caused 
disturbance inside coffee shop, officers justified in stopping vehicle containing two white men close
to shop, even though no traffic violation committed before the stop). 

 The 9-1-1 call from Linda asked for dispatch to send officers to interview witnesses who had
information about the copper wire thefts. She described the suspects as two men in a red Ford
Taurus being driven on County Road 292. Further, the record contains evidence that a witness, an
electric cooperative employee, communicated information to Roy. McAllister made no challenge
to the credibility of the witnesses or the reliability of the information provided by them at trial. Roy
then spoke with dispatch to relay the witness' description of the vehicle and suspects. Charlo was
told to stop a 1980-1990s model red Ford hatchback containing two white men in their twenties
traveling on 1249 north going toward 292. These facts, taken together with rational inferences,
warranted the stop of the red Ford hatchback on County Road 292, which contained suspects
matching the description issued an hour and a half earlier. We conclude Charlo had reasonable
suspicion to initiate the stop based on credible witness description, and the proximity in time and
geography in relation to the crime.

 We affirm the judgment of the trial court. 



 Jack Carter

 Justice


Date Submitted: July 23, 2008

Date Decided: August 22, 2008


Do Not Publish
1. County Road 288 runs parallel to County Road 292, both intersecting at 1249. 



d at bar. 

 The further question is whether the evidence would support a jury's finding that Canida was
guilty as being criminally responsible for the acts of Jackson or Johns.

 Section 7.01 of the Texas Penal Code provides that a person is criminally responsible as a
party if the offense is committed by his own conduct, or by that of another for which he is criminally
responsible. Tex. Penal Code Ann. § 7.01 (Vernon 2003). Section 7.02 states that a defendant is
criminally responsible for an offense committed by the conduct of another if, acting with intent to
assist in the commission of the offense, he "solicits, encourages, directs, aids, or attempts to aid the
other person to commit the offense." Tex. Penal Code Ann. § 7.02 (Vernon 2003). In determining
whether an accused bears criminal responsibility for an offense, we may look to events before,
during, and after the commission of the offense. Marable v. State, 85 S.W.3d 287, 293 (Tex. Crim.
App. 2002). Furthermore, a person can be convicted as a party even if (as in this case) the
indictment does not explicitly charge him as a party. Powell v. State, 194 S.W.3d 503, 506 (Tex.
Crim. App. 2006).

 The State provided strong evidence that Johns and Jackson were involved in a
methamphetamine cooking operation. The result of the cooking operation was their possession of
the methamphetamine so produced. Thus, if the evidence proves that Canida intentionally solicited,
encouraged, directed, aided, or attempted to aid them in the manufacturing process, it necessarily
proves a connection with the finished product as well.

 There is evidence that Jackson was both in possession of methamphetamine and that would
readily support a conclusion that he was assisting with the manufacture. The evidence shows that
Canida gave Jackson permission to stay in his trailer at the camp. There is some evidence that
Canida had been (during the prior year) at the camp four to six times, and some evidence that he was
there regularly, although that evidence is entirely imprecise. There was evidence that Canida was
coming to the camp (with methamphetamine in his possession) and that, when he saw officers there,
he slowed down and then turned to leave, in what could be construed as an attempt to avoid an
encounter with the police. In the absence of any knowledge of illegal activity at the camp, Canida
would have less of a reason to avoid police--although that argument is strained because, even if he
had no knowledge of illegal acts at the camp, he was at that time in possession of a small amount
of methamphetamine. The fact that the contraband he had in his possession was the same type of
drug as was being manufactured at the camp allows some inference that he was going to the camp
to protect his interest in the product being created, but we are also aware that methamphetamine is
currently rampant and is not so unique or unusual as to allow any conclusive presumptions to be
drawn from Canida's possession of the small amount in his truck.

 For Canida to have permitted this miscreant to live in his trailer shows bad judgment, but
does not necessarily make him a party to possession of the miscreant's drugs. For Canida to turn and
try to avoid police might show knowledge of what the miscreant was doing, but is equally
understandable for other reasons, since Canida had an illegal drug in his truck at the time. In the
absence of any evidence that Canida was at the camp during any relevant time frame when he might
have acquired knowledge of the manufacture, presumptions of knowledge from any apparent
cooking process cannot be drawn. The wooden building was secured by a lock, and there is evidence
that only Thompson and Canida had a key to the building and that Thompson had not given his key
to anyone else. Nevertheless, the building was open, and Jackson and Johns were using that building
for part of the wash process used in the manufacturing process.

 This evidence, when reviewed in the light most favorable to the verdict, can be said to
support a conclusion that Canida was aware of the activity, and that he was supporting its conduct
by allowing one of the actors to stay there and conduct the criminal activity in an area that Canida
claimed to possess. Thus, the evidence is legally sufficient to support the verdict.

 In a factual sufficiency review, we view all the evidence in a neutral light and determine
whether the evidence supporting the verdict is so weak that the jury's verdict is clearly wrong and
manifestly unjust or whether the great weight and preponderance of the evidence is contrary to the
verdict. See Watson, 204 S.W.3d at 417. This evidence is weak.

 Summarized, the evidence which favors conviction shows that:

 (a) law enforcement officers arrived at the Fish Camp in time to catch Jackson and Johns
involved in a methamphetamine cooking operation;

 (b) Canida and his wife owned the camper trailer in which Jackson was staying and there
were prescription drugs for a heart condition labeled for Jackson in the trailer;

 (c) Canida had been seen in the area by a law enforcement officer four to six times in the
previous year;

 (d) the account for the provision of electrical service to the entire Fish Camp was held
in Canida's name;

 (e) the general premises of the Fish Camp were littered with the kinds of trash and
paraphernalia which are common to the manufacture and use of methamphetamine;

 (f) when Canida arrived near the area of the Fish Camp and detected the presence of
strangers there, he diverted his course and went away; and

 (g) when Canida was stopped by an officer for not wearing his seat belt, there was a small
amount of methamphetamine in the truck he was driving (the possession of which he has been
separately charged).

 The evidence contravening those things is as follows:

 (a) there was no evidence that Canida was actually aware that methamphetamine was
being manufactured or stored at the Fish Camp;

 (b) another person was actually residing in Canida's camper trailer at the time;

 (c) although the electrical service contract was held in Canida's name, it was a matter of
convenience because two other people equally shared the cost of provision of this utility;

 (d) even though Canida had joint use of the metal and wooden buildings on the property
and the property itself, he did not have exclusive control of them;

 (e) because Canida had methamphetamine in his truck, which he would probably not
want anyone to discover, he had good reason to avoid peace officers who were at the Fish Camp;

 (f) except for the evidence that Canida had been seen around the Fish Camp area four
or five times in the last year, there was nothing to show that Canida was around at any time when
the methamphetamine-cooking operation was taking place or that he was aware that it was occurring;
and

 (g) there is nothing to show that Canida had any reason or occasion to check the area
around the burn barrel to examine its contents and, even if he had examined its contents, to know
the significance of the trash contained.

 In summation, although the State can tie Canida to the trailer (as its owner), to the Fish Camp
and its environs (as one of its co-possessors), and to Jackson (as Jackson's landlord), there is
factually insufficient evidence to connect Canida to the methamphetamine for which he has been
charged in this case.

 We reverse the judgment and remand the case to the trial court for further proceedings.



 Bailey C. Moseley

 Justice


Date Submitted: March 20, 2007

Date Decided: April 3, 2007


Do Not Publish

1. These belonged to Ken Maddox, Gary Thompson, and Woody Farmer. 
2. The officers chased Leon Jackson into one of the buildings and captured both Jackson and
Curtis Johns on the premises. The officers testified that they immediately recognized that the
location was being used to cook methamphetamine, immediately obtained a search warrant, and then
searched the other buildings.
3. Specifically, officers found Drainout, ether, acetone, coffee filters, ephedrine powder, and
starting fluid.
4. The Texas Court of Criminal Appeals recently wrote in Evans v. State, 202 S.W.3d 158, 162
(Tex. Crim. App. 2006), that these should be called "links" rather than "affirmative links" hereafter,
as using the modifier "affirmative" adds to much confusion within the context of a factual sufficiency
review.
5. As a sidenote, the officer who stopped Canida's pickup truck did so based on a seat belt
violation, and truthfully acknowledged that he could have arrested Canida for that traffic violation,
and would probably have done so instead of giving him a citation--and would of course then have
been forced to inventory the vehicle before it was towed.